*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MARCUS L. DAVID, also known as MARCUS L.
DAVIS, as Personal Representative of the ESTATE
OF WILLIE MAY TURNAGE,

UNPUBLISHED
August 15, 2024

　　　　Plaintiff-Appellant,

v

No. 367950
Muskegon Circuit Court
LC No. 2022-002291-NI

QUINCY HALL and TOTAL CARE
TRANSPORTATION, LLC,

　　　　Defendants-Appellees.

Before: SWARTZLE, P.J., and K. F. KELLY and YOUNG, JJ.

PER CURIAM.

Plaintiff appeals by right the trial court's order granting summary disposition in favor of defendants under MCR 2.116(C)(10), concluding that plaintiff failed to demonstrate that the decedent suffered a "threshold injury" under MCL 500.3135 such that plaintiff could not maintain his third-party lawsuit against defendants. However, because there were genuine issues of material fact whether the decedent's injury impaired her ability to lead a normal life, the trial court erred when it granted defendants' motion, and we reverse and remand for further proceedings.

## I. BASIC FACTS AND PROCEDURAL HISTORY

On July 17, 2019, the decedent, Willie May Turnage, was being transported for dialysis treatment by defendant Quincy Hall, who was employed by defendant Total Care Transportation, LLC. The decedent required assistance getting to dialysis because she had been in a wheelchair since 2018 after experiencing weakness in her legs for several months, had previously been diagnosed with dementia, and had three strokes in 2018 and 2019. On the return trip from the dialysis center, Hall encountered a railroad track and brought the transportation van to a stop. Hall claimed that as he was applying the breaks, he heard a noise from the back of the van and turned to see the decedent "sloped" out of her wheelchair and noticed the security strap had worked itself from her waist to underneath her armpits. Hall stated that he was able to resecure the decedent, who did not complain of any injury, and returned her to her home.

-1-

Plaintiff, the decedent's grandson, testified however that when Hall and the decedent returned to the house, Hall told plaintiff that he forgot to secure the strap around the decedent "and she fell forward out of her wheelchair . . . ." Plaintiff stated that shortly after returning home, the decedent complained of leg pain as plaintiff was placing her in her bed. It was then discovered that the decedent's left femur was broken. The decedent was immediately taken to the hospital and underwent surgery. The decedent made a full recovery after approximately two months but later died from complications related to COVID-19.

Plaintiff subsequently brought suit on behalf of the decedent's estate, seeking to hold defendants liable under theories of negligence and vicarious liability. Defendants moved for summary disposition under MCR 2.116(C)(10), arguing that because the decedent was already wheelchair-bound and suffering from dementia, plaintiff could not show that the injury to the decedent's leg impaired her ability to lead a normal life. The trial court agreed, stating:

> She was in the wheelchair. When she was at home she could do the—There was no indication that her hands or that—that she couldn't do the puzzles because of the broken femur. She's in a hospital. She's doing therapy. She's doing what she needs to do. She's on pain medication.
>
> * * *
>
> Because she had a broken femur, it didn't stop from visiting and having communications with family and friends and that form of her life. And because, you know, it's the dementia is there, and she's had that, and it goes back and forth, I just—Reading and looking at the affidavit and all of the information that I have, I just don't see that it has met that threshold of a [sic] impairment of a bodily function.

After the trial court entered its written order granting defendants' motion, plaintiff moved for reconsideration, which the trial court also denied. This appeal followed.

## II. STANDARDS OF REVIEW

The Court reviews de novo a trial court's decision on a motion for summary disposition. *Hastings Mut Ins Co v Grange Ins Co of Mich*, 319 Mich App 579, 583; 903 NW2d 400 (2017). "A motion for summary disposition made under MCR 2.116(C)(10) tests the factual sufficiency of the complaint." *Lockport Twp v Three Rivers*, 319 Mich App 516, 519; 902 NW2d 430 (2017) (quotation marks and citation omitted). "Summary disposition under MCR 2.116(C)(10) is appropriate when, '[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law.' " *Id*., quoting MCR 2.116(C)(10).

This Court also reviews de novo issues of statutory interpretation. *Hastings Mut*, 319 Mich App at 583. When interpreting a statute, the Court's goal is to "discern and give effect to the intent of the Legislature." *Id*. at 584 (quotation marks and citation omitted). "If the language of a statute is clear and unambiguous, the statute must be enforced as written and no further judicial construction is permitted." *Id*. (quotation marks and citation omitted).

## III. ANALYSIS

On appeal, plaintiff argues that the trial court erred when it granted defendants' motion for summary disposition because there was a genuine issue of material fact whether the decedent's injury affected her ability to lead a normal life. We agree.

An individual is " 'subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement.' " *Patrick v Turkelson*, 322 Mich App 595, 606; 913 NW2d 369 (2018), quoting MCL 500.3135(1). The term "serious impairment of body function" means under the statute that the "impairment that satisfies all of the following requirements":

> (a) It is objectively manifested, meaning it is observable or perceivable from actual symptoms or conditions by someone other than the injured person.
>
> (b) It is an impairment of an important body function, which is a body function of great value, significance, or consequence to the injured person.
>
> (c) It affects the injured person's general ability to lead his or her normal life, meaning it has had an influence on some of the person's capacity to live in his or her normal manner of living. Although temporal considerations may be relevant, there is no temporal requirement for how long an impairment must last. This examination is inherently fact and circumstance specific to each injured person, must be conducted on a case-by-case basis, and requires comparison of the injured person's life before and after the incident. [MCL 500.3135(5).]

See also *McCormick v Carrier*, 487 Mich 180, 195; 795 NW2d 517 (2010) ("[T]hree prongs . . . are necessary to establish a 'serious impairment of body function': (1) an objectively manifested impairment (2) of an important body function that (3) affects the person's general ability to lead his or her normal life.").

Under the first prong—whether there is an objectively manifested impairment—the plaintiff must present evidence of "actual symptoms or conditions that someone other than the injured person would observe or perceive as impairing a body function." *McCormick*, 487 Mich at 196; see also MCL 500.3135(5)(a). The second prong—whether the impairment is of an important bodily function—is "an inherently subjective inquiry that must be decided on a case-by-case basis, because what may seem to be a trivial body function for most people may be subjectively important to some, depending on the relationship of that function to the person's life." *Id*. at 199; see also MCL 500.3135(5)(b). And under the third prong:

> [T]he common understanding of to "affect the person's ability to lead his or her normal life" is to have an influence on some of the person's capacity to live in his or her normal manner of living. By modifying "normal life" with "his or her," the Legislature indicated that this requires a subjective, person- and fact-specific inquiry that must be decided on a case-by-case basis. Determining the effect or influence that the impairment has had on a plaintiff's ability to lead a normal life

-3-

necessarily requires a comparison of the plaintiff's life before and after the incident. [*Id*. at 202.]

See also MCL 500.3135(5)(c).

In *Piccione v Gillette*, 327 Mich App 16, 17; 932 NW2d 197 (2019), the injured claimant, a three-year-old boy, was in a motor vehicle accident in which he broke his left shoulder. The boy was given a sling and medicine for the pain, and "physically recovered" after three or four months. *Id*. The trial court entered summary disposition in favor of defendants, concluding that because the boy was able to make a full recovery, the injury "did not rise to the level of a serious impairment to a body function." *Id*. at 18. This Court reversed, stating that "a jury could conclude that Gavino's general ability to lead his normal life was affected by the impairment." *Id*. at 22. We noted:

> In this case, Gavino was a three-year-old child at the time he suffered the impairment. His parents testified that as a result of the impairment, he was unable to go to school for approximately two weeks and that when he did return to school he was unable to use the play equipment. Additionally, they testified that after the accident they had to help him go to the bathroom, including by carrying him to the bathroom. His father testified that before the accident, Gavino could dress himself, but afterward he could not. There was also testimony that Gavino needed help going up and down stairs because his balance was negatively affected by his impairment. Further, at times, his ability to sleep without pain was also compromised; his father testified that on occasion Gavino would wake up complaining about shoulder pain. The record also reflects that before the accident Gavino liked to color, but after the accident he did not want to do so. And before the accident he rode his bicycle, played soccer, and played with his scooter in the basement, but after he was injured he was unable to do so. His mother testified that, generally, Gavino was "cautious" about physical activities after the accident. [*Id*. at 21-22.]

The Court also highlighted that "a person's ability to lead his or her general life does not have to be destroyed in order to constitute a threshold injury; it only needs to have been *affected* . . . ." *Id*. at 23 (emphasis added). Thus, the fact that the boy made a full recovery did not foreclose his ability to recover under the statute. *Id*.

As in *Piccione*, in this case there was a question of fact whether the decedent was able to lead a normal life after the injury. Although it is undisputed that the decedent was in a wheelchair and was generally immobile before the accident, the evidence presented by plaintiff showed that after the accident, the decedent's life was negatively affected. The decedent's daughter, Susie Davis, stated that before the accident, the decedent was able to get out of bed under her own power but, as a result of the accident, could no longer move herself without assistance. Similarly, plaintiff testified that the decedent had difficulty doing her exercises and was not as "engaged" as she was before the accident. Contrary to the trial court's conclusion that the injury "didn't affect . . . her life" because both before and after the accident, "she still was in a wheelchair and she wasn't up running around," the testimony from both plaintiff and Susie raised an issue of fact whether the accident "affected" the decedent's mobility and general life after the accident. Similarly, the trial

court erred when it concluded that "[b]ecause [the decedent] had a broken femur, it didn't stop [her] from visiting and having communications with family and friends and that form of her life." To the contrary, Susie claimed that the decedent was confined to her bed and could not spend time with her family or outdoors as she did before the accident, both because of her need to be hospitalized and the "extreme[] difficult[y]" moving her.

Defendants appear to make the argument that because the decedent was able to make a complete recovery, her ability to lead a normal life was not affected. This argument is unpersuasive, however, because the fact that the decedent was able to make a recovery within two months of the accident is not dispositive. MCL 500.3135(5)(c) ("Although temporal considerations may be relevant, there is no temporal requirement for how long an impairment must last."); see also *Piccione*, 327 Mich App at 23 ("[A] person's ability to lead his or her general life does not have to be destroyed in order to constitute a threshold injury; it only needs to have been affected, and here the evidence allows for an inference that Gavino's general ability to lead his normal life was affected even though it was not completely destroyed."). Defendants also argue that the evidence that the decedent was suffering from a variety of complications and illnesses before the accident required entry of summary disposition on their behalf. While it is true that before the accident the decedent was wheelchair-bound and had general lower extremity weakness that required physical therapy, there was also evidence that the issues worsened as a result of the accident. Both plaintiff and Susie described the decedent's decrease in energy and inability to accomplish basic tasks, such as getting out of bed, as a result of the accident. Although defendants argue these impacts are *de minimis*, the statute simply requires that the injury "affected" the decedent's ability to lead a normal life. See MCL 500.3135(5)(c).

In sum, plaintiff presented sufficient evidence to create a genuine issue of material fact whether the decedent's injury affected her ability to lead a normal life, and the trial court erred when it granted defendant's motion for summary disposition on the issue.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. Plaintiff, as the prevailing party, may tax costs. MCR 7.219(A).


/s/ Brock A. Swartzle
/s/ Kirsten Frank Kelly
/s/ Adrienne N. Young